**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

**CITIZENS FOR RESPONSIBILITY**
**AND ETHICS IN WASHINGTON,**
1101 K Street, N.W., Suite 201
Washington, DC  20005,

**NOAH BOOKBINDER**
10206 Brookmoor Dr.
Silver Spring, MD  20901,

     Plaintiffs,

     v.

**FEDERAL ELECTION COMMISSION**
1050 First St., N.E.
Washington, DC  20463,

     Defendant.
_____

     Civil Action No.

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

     1.     This is an action for injunctive and declaratory relief under the Federal Election

Campaign Act of 1971 ("FECA" or "the Act"), 52 U.S.C. § 30109(a)(8)(A), challenging the

Federal Election Commission's ("FEC" or "Commission") failure to act on an administrative

complaint by Citizens for Responsibility and Ethics in Washington ("CREW") and Noah

Bookbinder (collectively "Plaintiffs") against Freedom Vote for violating the FECA by failing to

register as a political committee and file disclosure statements as required of political

committees, despite meeting the requirements of and acting as a political committee. The

complaint further alleged that Freedom Vote, Fighting for Ohio Fund, Christopher Marston,

individually and in his capacity as Treasurer of Fighting for Ohio Fund, and Unknown

Respondents (collectively "Respondents"), engaged in a conduit contribution scheme that kept

secret the names of donors by laundering their contributions to Fighting for Ohio Fund through

Freedom Vote, in violation of the FECA. Plaintiffs filed the administrative complaint on August

9, 2018. The FEC has failed to act on the administrative complaint, filed more than 9 months ago.

## JURISDICTION AND VENUE

2.      This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 52 U.S.C. § 30109(a)(8)(A) and 5 U.S.C. § 706. This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201(a), and 2202. Venue lies in this district under 52 U.S.C. § 30109(a)(8)(A) and 28 U.S.C. § 1391(e).

## PARTIES

3.      Plaintiff CREW is a non-profit, non-partisan corporation organized under section 501(c)(3) of the Internal Revenue Code.

4.      CREW is committed to protecting the right of citizens to be informed about the activities of government officials, ensuring the integrity of government officials, protecting our political system against corruption, and reducing the influence of money in politics. CREW works to advance reforms in the areas of campaign finance, lobbying, ethics, and transparency. Further, CREW seeks to ensure that campaign finance laws are properly interpreted, enforced, and implemented.

5.      To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information to the public about public officials and their actions, and the outside influences that have been brought to bear on those actions. A core part of this work is examining and exposing the special interests that have influenced our elections and elected officials and using that information to educate voters regarding the integrity of public officials, candidates for public office, the electoral process, and our system of government.

6.      Toward this end, CREW monitors the activities of those who run for federal office as well as those groups financially supporting candidates for office or advocating for or against their election. CREW regularly reviews campaign finance reports that groups, candidates, and political parties file with the FEC disclosing their expenditures and, in some cases, their contributors. Using the information in those reports, CREW, through its website, press releases, reports, and other methods of distribution, publicizes the role of these individuals and entities in the electoral process and the extent to which they have violated federal campaign finance laws.

7.      CREW also files complaints with the FEC when it discovers violations of the FECA. Publicizing violations of the FECA and filing complaints with the FEC serve CREW's mission of keeping the public, and voters in particular, informed about individuals and entities that violate campaign finance laws and deterring future violations of campaign finance laws.

8.      CREW is hindered in carrying out its core programmatic activities when those individuals and entities that attempt to influence elections and elected officials are able to keep their identities hidden. Likewise, the FEC's refusal to properly administer the campaign finance laws, particularly the FECA's reporting requirements, hinders CREW in its programmatic activity, as compliance with those reporting requirements often provides CREW with the only source of information about those individuals and groups funding the political process. As a result of the FEC's refusal to enforce the FECA, organizations and individuals are able to launder their contributions through third parties. This deprives CREW of information critical to advancing its ongoing mission of educating the public to ensure the public continues to have a vital voice in our political process and government decisions.

9.      As an example, in May 2016, CREW issued a report, *Welcome to Washington: New Members of Congress Attract Special Interest Money,* that analyzed fundraising by newly

elected members of Congress in their first year in office. CREW's analysis was based on FEC

campaign contribution records that identified contributions to those members from special

interest PACs, including PACs tied to corporations, unions, and issues groups. From this data,

CREW determined that new members of the House of Representatives embraced fundraising

from special interests after they took office and became more reliant on that money than they had

been as candidates. Those members raised nearly $17.3 million from special interest PACs in

2015, an increase of 15.8% over the amount they raised as candidates during the entire 2014

election cycle. CREW further found that special interest PAC money accounted for an average of

37.6% of total funds raised by the new members in 2015, more than double the 17.3% average

rate from the 2014 election cycle. CREW was able to obtain this information because of the

disclosure requirements to which the organizations receiving those contributions – federal

candidates, party committees, PACs, and super PACs – are subject under the FECA.

10.     As another example, on August 21, 2017, CREW published a blog post entitled

*Synchronized Spending: The Dark Money Phantom's New Illusion*, which highlighted section

501(c)(4) dark money nonprofits that fully fund multiple federal super PACs that attack or

support the same candidates. By making the work of one group appear to be the work of two

independent groups, this tactic misleads the public, exaggerates candidates' outside support, and

exacerbates the problems caused by secret money in politics. CREW obtained the information

used in this post from information the FECA requires political committees to disclose.

11.     Plaintiff Noah Bookbinder is the executive director of CREW. He is a citizen of

the United States and a registered voter and resident of the state of Maryland. As a registered

voter, Mr. Bookbinder is entitled to receive all the information the FECA requires those engaged

in political activities to report publicly. He is further entitled to the FEC's proper administration

of the provisions of the FECA. Mr. Bookbinder is harmed in exercising his right to an informed

vote when a political committee fails to report the true source of its contributions, as the FECA

requires.

12.     When Plaintiffs file complaints against violators of the FECA, they rely on the

FEC, as the preliminary civil enforcement authority, to comply strictly with the FECA when

making its investigative and enforcement decisions. *See* 52 U.S.C. § 30107(e). Plaintiffs are

harmed and are "aggrieved" parties when the FEC refuses to act on meritorious complaints,

refuses to enforce the FECA's mandatory disclosure requirements, or otherwise acts contrary to

the requirements of the FECA. *See* 52 U.S.C. § 30109(a)(8)(C).

13.     Defendant FEC is the federal agency established by Congress to oversee the

administration and civil enforcement of the FECA. *See* 52 U.S.C. §§ 30106, 30106(b)(l).

## STATUTORY AND REGULATORY BACKGROUND

14.     The FECA and the implementing FEC regulations impose disclosure

requirements to ensure the public and voters are fully apprised of election-related spending.

These include the requirement to report "independent expenditures," to include disclaimers on

advertisements, to register as a "political committee," as well as other organizational and

disclosure requirements. Further, the FECA and FEC regulations require the disclosure of the

true source of contributions.

15.     The FECA and implementing FEC regulations define a "political committee" as

"any committee, club, association, or other group of persons which receives contributions

aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating

in excess of $1,000 during a calendar year." 52 U.S.C. § 30101(4)(A); 11 C.F.R. § 100.5(a).

16.     The FECA defines an "expenditure" as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(9)(A).

17.     In *Buckley*, the Court carved out from the reach of the FECA's political committee provisions groups that, while they met the statutory definition, were neither under the control of a candidate nor had the requisite "major purpose" to nominate or elect of federal candidates. *See Buckley v. Valeo*, 424 U.S. 1, 79 (1976).

18.     An organization's major purpose may be demonstrated by its activities, and a group that devotes a sufficiently extensive amount of its spending to campaign activity in a calendar year may be subjected to the FECA's political committee provisions. *See FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986). Alternatively, an organization's major purpose may be demonstrated by its statement confirming is has an organizational purpose of influencing elections. FEC, Political Committee Status, 72 Fed. Reg. 5595, 5601 (Feb. 7, 2007)

19.     The FECA and FEC regulations require all political committees to register with the FEC within 10 days of becoming a political committee. 52 U.S.C. § 30103(a); 11 C.F.R. § 102.1.

20.     Further, under the FECA and implementing FEC regulations, political committees must file periodic reports with the FEC that, among other things: (1) identify all individuals contributing an aggregate of more than $200 in a year to the organization, and the amount each individual contributed; (2) identify all political committees making a contribution to the organization, and the amount each committee contributed; (3) detail all of the organization's outstanding debts and obligations; and (4) list all of the organization's expenditures, including its

independent expenditures and electioneering communications. 52 U.S.C. § 30104(a)(4), (b), (f)(2); 11 C.F.R. §§ 104.3, 104.4, 104.20(b).

21.     In addition, the FECA requires all persons, including political committees, to report to the FEC "independent expenditure[s]" they make. 52 U.S.C. § 30104(b)(4)(H)(iii), (c). An independent expenditure is an expenditure by a person that "expressly advocat[es] the election or defeat of a clearly identified candidate" that is made independently of such candidate or party. 52 U.S.C. § 30101(17). Persons who are not political committees who make over $250 in independent expenditures in a calendar year must file a statement with the FEC disclosing, among other things, the identity of any contributor who contributes more than $200 a year to the independent expenditure maker, and the identity of any contributor who gave more than $200 to further an independent expenditure. 52 U.S.C. § 30104(c)(1), (c)(2)(C).

22.     In requiring political committees and independent expenditure makers to disclose the identity of contributors, the FECA requires the disclosure of the true source of contributions. To ensure the public learns the true source of a contribution and to prevent the reporting of a mere pass-through entity as that source, the FECA and FEC regulations prohibit making a contribution in the name of another person, knowingly permitting one's name to be used for the purpose of making a contribution in the name of another person, and knowingly accepting a contribution made by one person in the name of another person. Specifically, 52 U.S.C. § 30122 provides: "No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person."

23.     FEC implementing regulations echo these prohibitions on making a contribution in the name of another, knowingly permitting one's name to be used to effect a contribution,

knowingly helping or assisting another to do so, and knowingly accepting a contribution made by one person in the name of another person. 11 C.F.R. § 110.4(b). The regulation includes, as an example of a prohibited contribution, giving money, "all or part of which was provided to the contributor by another person (the true contributor) without disclosing the source of money[.]" *Id.* at § 110.4(b)(2).

24.     Under the FECA, any person who believes there has been a violation of the Act may file a sworn complaint with the FEC. 52 U.S.C. § 30109(a)(l). Based on the complaint, the response from the person or entity alleged to have violated the Act, facts developed by the Office of General Counsel ("OGC"), and any OGC recommendation, the FEC decides whether there is "reason to believe" a violation of the FECA has occurred. 52 U.S.C. § 30109(a)(2).

25.     A "reason to believe" exists where a complaint "credibly alleges" a violation of the FECA "may have occurred." FEC, Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process, 72 Fed. Reg. 12545 (Mar. 16, 2007). If four commissioners find there is "reason to believe" a violation of the FECA has occurred, the FEC must notify the respondents of that finding and "shall make an investigation of such alleged violation." 52 U.S.C. § 30109(a)(2).

26.     The FECA further provides that the complainant may sue the FEC 120 days after filing the complaint if the FEC "fail[s] to act" on the complaint. 52 U.S.C. § 30109(a)(8)(C). The FEC has a legal duty to take final action on a complaint expeditiously. 52 U.S.C. § 30107(a)(9). A court that finds the FEC has failed to act expeditiously may declare the failure contrary to law and order the FEC to conform with that declaration within thirty days. *Id.* If the FEC continues to fail to act and does not conform with the declaration within thirty days, "the complainant may

bring, in the name of such complainant, a civil action [against the respondent] to remedy the violation involved in the original complaint." *Id.*

## FACTUAL BACKGROUND

27.     On August 9, 2018, CREW and its executive director Noah Bookbinder filed an administrative complaint with the FEC against Freedom Vote, Fighting for Ohio Fund, Christopher Marston, individually and in his capacity as Treasurer of Fighting for Ohio Fund, and Unknown Respondents. The matter was given MUR number 7465. A copy of the administrative complaint is attached as Exhibit 1.

28.     The complaint alleged that Freedom Vote spent over $1 million on an advertisement that was an independent expenditure "expressly advocating the election or defeat of a clearly identified candidate" but failed to report that independent expenditure to the FEC and failed to include the required disclaimer on the advertisement, both in contravention of the FECA and applicable regulations.

29.     The complaint further alleged that Freedom Vote failed to register and report as a political committee from 2014 onward as required by the FECA and that Freedom Vote failed to report its receipt of contributions, its making of contributions, its debts, and its expenditures to the FEC as required under the FECA. Specifically, the complaint alleged that an advisor to Freedom Vote confirmed in public statements that its organizational purpose is to influence elections and that Freedom Vote spent $174,607 on independent expenditures in 2014, comprising approximately 61% of Freedom Vote's activities that year. Further, in its 2015 fiscal year, which ended September 30, 2016, Freedom Vote spent at least $1,121,077 on independent expenditures and reported expenditures of $1,700,000 in the form of transfers to Fighting for Ohio Fund and $44,267 on unidentified political activity. Altogether, that spending comprised

approximately 80.1% of Freedom Vote's activities that year.

30.    In addition, the complaint further alleged that Freedom Vote permitted its name to be used to effect a contribution in the name of another person by acting as a conduit to contribute $1.975 million from Unknown Respondents to Fighting for Ohio Fund, an independent expenditure-only political committee, known as a super PAC, in violation of 52 U.S.C. § 30122. The complaint further alleged that Fighting for Ohio Fund knowingly accepted a contribution from Freedom Vote in the name of another, in violation of 52 U.S.C. § 30122. Finally, the complaint alleged that Unknown Respondents, the "true source" of the funds ultimately donated to Fighting for Ohio Fund, violated 52 U.S.C. § 30122 by contributing the funds in the name of Freedom Vote.

31.    Specifically, Plaintiffs' complaint alleged that Fighting for Ohio Fund disclosed receiving $1.975 million from Freedom Vote during the 2016 election cycle. Freedom Vote and Fighting for Ohio Fund shared the same fundraiser, MMM Consulting, which raised $2,090,000 for Freedom Vote, a sum sufficient to cover all of Freedom Vote's contributions to Fighting for Ohio Funding during the 2016 election cycle. Furthermore, the money was received as a series of transfers, and five of the six transfers that Freedom Vote made to Fighting for Ohio Fund during its 2015 tax year correspond to exact amounts that Freedom Vote reported receiving on its Schedule of Contributors on its IRS Form 990 tax return. A  seventh transfer was made during the 2016 election cycle but following the close of the 2015 tax year. Fighting for Ohio Fund engaged in extensive political activity influencing a federal election in 2016. The super PAC spent more than $9.2 million on independent expenditures opposing former Gov. Ted Strickland, who was then a Democratic candidate in the Ohio Senate race.

32.    On August 13, 2018, the FEC sent Plaintiffs an acknowledgement letter

confirming receipt of the administrative complaint.

33.     As of the date of this filing, the FEC has not reached or made public a final

decision on MUR 7465, over 9 months after the filing of the administrative complaint.

34.     Certain FEC remedies for violations of the FECA are subject to a five-year statute

of limitations under 28 U.S.C. § 2462. Assuming there is no basis for tolling, the statute of

limitations would begin to limit the remedies available on Plaintiffs' allegations starting on

December 29, 2020.

35.     Significant delays in acting on a pending complaint are not uncommon at the

FEC, leading one FEC commissioner to express concern that "[e]ffective enforcement of the law

is undermined by pervasive delays." *In the Matter of American Conservative Union, et al.*,

Statement of Reasons of Comm'r Ellen L. Weintraub, MUR 6920 (Dec. 19, 2017), *available at*

http://bit.ly/2CDnumJ.

36.     The pervasive delays also often serve as a cause for other FEC commissioners to

halt enforcement actions. For example, on May 23, 2011, CREW filed a complaint with the FEC

alleging that the Commission on Hope, Growth and Opportunity ("CHGO") violated the FECA

by spending more than $2.3 million to broadcast television ads in 12 elections for seats in the

House of Representatives. Despite the nature and extent of the spending, CHGO failed to file

disclosures as required by the FECA and failed to register as a political committee, which CREW

alleged constituted violations of the FECA. *In the Matter of The Commission on Hope Growth

and Opportunity*, Complaint, MUR 6471 (May 23, 2011) *available at* http://bit.ly/2qHA6aL;

Amended Complaint, MUR 6471 (Apr. 26, 2012) *available at* https://bit.ly/2wBbjFD. The

complaint languished before the FEC, with months and even years passing between actions. *See*

Summary, MUR 6471 *available at* http://bit.ly/2o52aBt. Finally, in November 2015, more than

four years after CREW filed its complaint, three controlling commissioners voted to exercise their discretion to dismiss the case and close the file without finding reason to believe that there was a violation of the FECA, in part because the "statute of limitations [had] effectively expired." *Id.*, Statement of Reasons of Vice Chairman Matthew S. Petersen, and Comm'rs Caroline C. Hunter and Lee E. Goodman, MURs 6391 and 6471 (Nov. 6, 2015), *available at* http://bit.ly/2D8LW0m.

37.     Similarly, on February 27, 2015, CREW filed a complaint against American Conservative Union, Now or Never PAC, James C. Thomas III, and Unknown Respondent alleging legal violations stemming from a failure to disclosure the true source of a $1.71 million contribution to Now or Never PAC. *In the Matter of American Conservative Union, et al.,* Complaint, MUR 6920 (Feb. 27, 2015), *available at* http://bit.ly/2D6UHI7. OGC investigated the allegations and recommended finding reason to believe the respondents violated the FECA. *Id.*, First General Counsel's Report (Jan. 20, 2016), *available at* http://bit.ly/2swd1sQ. That report, however, sat before the commissioners for a full year, and by the time the FEC was willing to move forward on the matter it was "just about out of time" with regard to the statute of limitations. *Id.*, Statement of Reasons of Comm'r Ellen L. Weintraub (Dec. 19, 2017), *available at* http://bit.ly/2CDnumJ.

38.     While the FEC eventually found reason to believe that certain respondents violated the FECA, resulting in a $350,000 fine, the controlling commissioners ultimately declined to pursue investigation and enforcement against other unknown respondents who were either the true source of the contribution or also acted as a conduit, justifying this decision in large part due to the impending statute of limitations. *Id.*, Statement of Reasons of Vice Chair Caroline C. Hunter and Comm'r Lee E. Goodman (Dec. 20, 2017), *available at*

http://bit.ly/2CTqQ8q. The decision not to pursue further investigation constituted "an egregious example of someone using a web of organizations to hide the true source of a $1.7 million contribution to a super PAC — and getting away with it." *Id.*, Statement of Reasons of Comm'r Ellen L. Weintraub (Dec. 19, 2017).

39.     CREW is not alone in having resolution of its complaints unlawfully delayed. For example, one complaint filed *in 2012* has still not been resolved, despite a recommendation from the FEC's Office of General Counsel that has been pending for over *1,665* days.  FEC, <u>Response to Questions from the Committee on House Administration</u>, 17 (May 1, 2019) [hereinafter "FEC, <u>Responses to Questions</u>"], *available at* https://bit.ly/2HjbrQ6. The Commission has held over consideration of that matter ten times and apparently has not even scheduled it for consideration since September 12, 2017. *Id.*

40.     Lack of enforcement due to extreme delay is widespread at the FEC. In a May 1, 2019 written statement to Congress, the FEC reported that, of the 289 cases on the enforcement docket as of that date, 45 of those cases "have at least some activity that is beyond the statute of limitations or will be before May 1, 2020." FEC, <u>Responses to Questions</u>, at 14. Recent data made public by the FEC shows that this issue is far from isolated. Rather, of cases the FEC identified in March as "Pending Without a Commission Vote for 12 Months," there are six cases where the General Counsel Report was circulated in 2014 or 2015 and ten with a "Circulation Date" of 2017. Federal Election Commission, <u>Memorandum: Status of Enforcement – Fiscal Year 2019, First Quarter (10/1/2018-12/31/2018)</u>, Mar. 8, 2019 (Exhibit 2).

41.     The FEC Chair testified to Congress that a sufficient number of commissioners capable of blocking agency action are intentionally delaying action on complaints in order to avoid enforcement of the FECA. *See* Chair Ellen L. Weintraub's Supplemental Responses to

Questions From the Committee on House Administration (May 1, 2019), *available at* https://bit.ly/2Wv4Pqi. By running out the clock and then citing the age of the complaint as a basis to exercise prosecutorial discretion to dismiss, these commissioners immunize their actions from judicial review under current case law—to the frustration of Congress's intent—while aiding and abetting violations of the law.

42.     On information and belief, that same bloc of commissioners—enough to block agency action—are delaying agency action on CREW's administrative complaint in MUR 7465 for the purpose of aiding and abetting the Respondents' violations of the law and evading judicial review of their illegal actions.

43.     Even when not used for illegal purposes, such delays commonly impact the FEC's ability to carry out its enforcement function, as documents may be destroyed or lost and witness memories may fade. Also, the organization at issue may shut down or cease operations making it more difficult to access document and witnesses. In addition, the running of the five-year statute of limitations constrains the FEC's enforcement, as after the statute has run, it can no longer issue fines.

44.     These delays also hamper Plaintiffs' ability to access the information that it is entitled to under the statute. Furthermore, to the extent evidence is lost or degraded during a multi-year delay at the FEC, the delay undermines Plaintiffs' ability to litigate under the FECA should Plaintiffs file a suit alleging that an FEC final action is contrary to law, or if Plaintiffs bring a civil action in their own names as permitted by the FECA.

**CAUSE OF ACTION**

(FEC Inaction Contrary to Law)

45.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

46.     The FEC first received Plaintiffs' complaint against Freedom Vote on August 9, 2018, more than nine months ago.

47.     Plaintiffs' administrative complaint credibly alleged violations of FECA and FEC regulations by Respondents. In addition, the FEC has all the information required to take final agency action with respect to Plaintiffs' complaint, and no additional agency resources are required.

48.     The FEC has failed to act in a timely manner on the administrative complaint. To date, the FEC has not reached a resolution of the matter or disclosed taking any action on the administrative complaint.

49.     Sufficient time has elapsed to allow the FEC to conduct an investigation of MUR 7465. The FEC's failure to act on the administrative complaint is unreasonable and contrary to law under 52 U.S.C. § 30109(a)(8), and the Court may compel the FEC to act.

50.     Any party aggrieved by the failure of the FEC to act on an administrative complaint may petition the Court for a declaration that the failure is unlawful and for an order that the FEC conform with this declaration within 30 days. 52 U.S.C. § 30109(a)(8).

51.     Action by the FEC on MUR 7465 may result in the FEC compelling Freedom Vote to register as a political committee and file the required information disclosures, as well as compelling the other Respondents to disclose the source of the contributions to Fighting for Ohio

Fund. If the FEC determines that any of the Respondents acted knowingly and willfully, it may make a referral to the Department of Justice for investigation into possible criminal penalties.

52.     Plaintiffs have been harmed by the FEC's failure to act on the administrative complaint. The FEC's failure to act has allowed Freedom Vote to continue to keep confidential information that, under the FECA, it was required to disclose. This failure to disclose information to which Plaintiffs are entitled hinders CREW in its programmatic activity and hinders Mr. Bookbinder in his ability to review campaign finance information.

53.     Thorough investigation of administrative complaints and timely action by the FEC in making a final determination is in the public interest, and the FEC should rule on Plaintiffs' administrative complaint without further delay.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)     Declare that the FEC's failure to act on Plaintiffs' Complaint (MUR 7465) is contrary to law;

(2)     Order the FEC to act on the Complaint within 30 days, pursuant to 52 U.S.C. § 30109(a)(8)(C); and

(3)     Grant such other and further relief as the Court may deem just and proper.


Respectfully submitted,


 */s/ Laura C. Beckerman*
Laura C. Beckerman
(D.C. Bar No. 1008120)
Stuart McPhail
(D.C. Bar No. 1032529)
Adam J. Rappaport
(D.C. Bar No. 479866)
Citizens for Responsibility and Ethics
   in Washington
1101 K Street, N.W., Suite 201
Washington, DC 20005
Phone: (202) 408-5565
Fax: (202) 897-1996
lbeckerman@citizensforethics.org